IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BLUE RIDGE SAVINGS BANK, INC., | |
| Plaintiff, | Civil Action No. 14-264 |
| v. | **JURY TRIAL DEMANDED** |
| CHARLES H. TAYLOR AND DWAYNE H. WISEMAN, | |
| Defendants. | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Blue Ridge Savings Bank, Inc. ("FDIC-R"), hereby files its Complaint against Defendants Charles H. Taylor ("Taylor") and Dwayne H. Wiseman ("Wiseman") (collectively, Taylor and Wiseman are referred to herein as the "Defendants") for damages the Defendants caused by their tortious conduct, showing the Court the following:

## I.  INTRODUCTION

1.  The FDIC brings this case in its capacity as Receiver for Blue Ridge Savings Bank, Inc. ("BRSB" or "Bank"), pursuant to authority granted by 12 U.S.C. § 1821. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, powers, and privileges of the Bank and, among others, the depositors, accountholders, and stockholders of the Bank, including, but not limited to, BRSB's claims against the Bank's former directors and officers as set forth herein. In this action, the FDIC-R seeks to recover

1

damages resulting from the tortious conduct of the Defendants. The FDIC-R is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819.

2.      The FDIC-R seeks to recover compensatory damages of at least $7.583 million caused by the Defendants' breach of their fiduciary duties in connection with fourteen loans—including acquisition, development and construction ("ADC"), speculative residential construction and commercial loans—that were approved between December 5, 2005 and September 11, 2008 (collectively, the "Loss Transactions," which are set forth in detail in paragraphs 58-163, below), in violation of the Bank's loan policies (referred to cumulatively as the "Loan Policy") and prudent lending practices, as alleged more particularly below.

3.      The Defendants breached their fiduciary duties to BRSB and were negligent and grossly negligent by, among other things, approving the Loss Transactions, in violation of the Bank's Loan Policy and prudent lending practices.

4.      In this lawsuit, the FDIC-R does not seek to collect from BRSB's borrowers or guarantors any unpaid loans, but rather seeks to collect damages from the Defendants for negligence, gross negligence, and breaches of fiduciary duties. The compensatory damages sought herein are those caused by the Defendants' tortious and wrongful conduct in approving such lending of depositors' money, which is the direct and proximate cause of the damages the FDIC-R now seeks to recover.

5.      As an officer and as directors, the Defendants had the duty to safeguard BRSB's financial condition, make informed, good-faith decisions, and ensure safe and sound banking practices, including operating and managing the lending function of the Bank. The Defendants were obligated to comply and ensure compliance with banking laws, regulations, and supervisory guidance.

2

6.      Among other things, the Defendants:

a.      improperly extended credit to borrowers who were not creditworthy;

b.      extended credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information, resulting in loans advanced to borrowers with no apparent ability to repay or otherwise service the loans;

c.      approved loans which violated BRSB's Loan Policy and applicable federal and state regulations, including loans which they knew would exceed the Bank's lending limits on the amount that could be loaned as a percentage of the value of the collateral securing the loan ("loan-to-value" or "LTV" ratios);

d.      approved loans in which appraisals on loan collateral were either not performed or failed to meet the requirements of the Uniform Standards of Professional Appraisal Practice or of state law and regulations;

e.      approved loans that they knew or had reason to know were improperly underwritten and/or imprudent, including origination of loans in which the borrowers lacked the demonstrated ability to repay, in which collateral was inadequate, and/or in which collectability was not reasonably assured;

f.      allowed and encouraged excessive concentrations of commercial real estate ("CRE") loans, which included ADC loans; and

g.      approved CRE loans, despite high-risk over-concentrations of such loans on the Bank's balance sheet, demonstrable deterioration in the Bank's existing CRE loan portfolio, and known adverse economic and market conditions.

3

7.     The FDIC-R seeks recovery of damages directly and proximately caused by the Defendants' negligence, gross negligence, and breaches of fiduciary duty in their approval of the Loss Transactions.

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction of this matter because actions in which the FDIC is a party are deemed to arise under federal law.  *See* 12 U.S.C. § 1811, *et seq*.; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  *See* 12 U.S.C. § 1819.

9.     This Court has personal jurisdiction over the Defendants who at all relevant times were residents of and/or conducted the Bank's business in the State of North Carolina.

10.     Venue is proper in this district under 28 U.S.C. § 139l(b) as both Defendants reside in this district and division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

## III.     THE PARTIES

11.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  The North Carolina Commissioner of Banking ("NCCB") closed BRSB, a state nonmember bank, on October 14, 2011 and appointed the FDIC as Receiver for BRSB.  *See* 12 U.S.C. § 1821(c).

12.     When BRSB failed, it had $161.4 million in assets, and the loss to the Deposit Insurance Fund is currently estimated at $47.3 million.

13.     Defendant Taylor was Chairman of the Board of Directors ("Board") and a Loan Committee member from the Bank's inception in 1978 until its failure.  Taylor owned 99.9

4

percent of the Bank's common stock.  Taylor is a resident of the State of North Carolina residing in Transylvania County.

14.     Defendant Wiseman was President and Chief Executive Officer, a director, and a member of the Loan Committee from 1999 until the Bank's failure.  Wiseman owned 500 shares, or 0.017 percent, of the Bank's common stock.  Wiseman is a resident of the State of North Carolina residing in Haywood County.

15.     The Defendants, along with Taylor's wife, comprised a majority of BRSB's Board, from around October 2008 until the Bank's failure on October 14, 2011.

IV.     **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

    A.     **History of the Bank and Its Aggressive Growth**

16.     BRSB was incorporated on March 23, 1978, as Blue Ridge Savings & Loan Association, Inc., and after a name change, became Blue Ridge Savings Bank, Inc., on December 1, 1987.  In May 2001, BRSB converted from a state-chartered savings and loan association to a federal savings bank charter.   Effective December 31, 2007, BRSB converted to a state nonmember savings bank.  BRSB was located in Asheville, North Carolina, and it operated ten branches in Asheville and the surrounding communities.

17.     In a CRE loan, a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property. Regulators, the real estate industry, and lending institutions recognize that CRE loans have unique risks.  The types of borrowers include significant numbers of project developers, builders, and speculators, often with multiple concurrent projects, whose revenues and costs are subject to fluctuations depending on current real estate values, among other things.

5

18.     ADC loans are a subset of CRE loans.  In an ADC loan, loan proceeds are used to acquire, develop and/or construct commercial projects, such as single family residential subdivisions, commercial office buildings, condominiums, and similar projects.  ADC lending is considered the riskiest class of CRE due to long development times and because ADC lending can include properties that are built before having commitments from buyers.  In addition, by the time the construction phase is completed, market demand may have fallen – placing downward pressure on sales prices – making this type of loan more volatile.

19.     The Bank's Loan Policy recognized the unique risks of lending concentrations in any category of loans.  For example, the Loan Policy warned that "[c]oncentrations within or dependent on a particular industry are subject to risk factors of external economic conditions and market acceptance, which might equally affect all members of the group."  *See* Loan Policy § 1. The Loan Policy also stated that "[c]onstruction lending is one of the most hazardous types of lending activity because of the numerous pitfalls that may be encountered in the process of construction."  *See id.*, § 7.

20.     Prior to December 2005, and continuing until her termination in June 2008, BRSB's Chief Credit Officer, Michelle Wood ("Wood"), repeatedly warned the Defendants about the risky nature of CRE lending, the BRSB loan officers' lack of experience in underwriting CRE loans, and the poor underwriting quality of the CRE loans presented to the Loan Committee for approval, including certain of the Loss Transactions.

21.     As noted in the Board's meeting minutes, the Defendants also were aware of "the current real estate bubble" in BRSB's market area at least as early as October 2005.  According to a January 5, 2009 Management Study of the Bank prepared by Hoover & Associates, LLC, the Defendants additionally "recognized a probable downturn in the real estate industry in 2006."

22.     On or about January 13, 2006, the FDIC issued Financial Institution Letter FIL-4-2006, "Commercial Real Estate Lending," announcing proposed guidance by the federal bank and thrift regulatory agencies, including the Office of Thrift Supervision ("OTS"), BRSB's federal regulator at that time, concerning sound risk management practices for concentrations in CRE lending.  The proposed guidance became final on December 12, 2006.  *See Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580-01 (Dec. 12, 2006) ("CRE Guidance").

23.     As explained in the release, the agencies issued the guidance in light of the increase in the number of banks whose risk management practices were not evolving with growing CRE concentrations.  The release noted the existence of "substantial potential risks posed by credit concentrations, especially in sectors such as CRE, which history has shown to have cycles that can, at much lower concentration levels, inflict large losses upon institutions," and that "concentrations in CRE lending coupled with weak loan underwriting and depressed CRE markets have contributed to significant credit losses in the past."

24.     Among other things, the CRE Guidance stated that regulators would consider banks with CRE concentrations exceeding 300% of risk-based capital, potentially exposed to significant CRE concentration risk, thereby warranting heightened risk-management practices.

25.     The CRE Guidance stressed that "strong risk management practices and appropriate levels of capital are important elements of a sound CRE lending program, particularly when an institution has a concentration in CRE loans."

26.     The Guidance admonished that the "key elements in establishing a risk management framework that effectively identifies, monitors, and controls CRE concentration risk [include] Board and management oversight; portfolio management; management

7

information systems; credit underwriting standards; portfolio stress testing and sensitivity analysis; [and] credit risk review function."

27.     Notwithstanding their knowledge of these warnings and other deficiencies alleged herein, the Defendants approved the Loss Transactions anyway, in reckless disregard for the safety of the Bank, its depositors and accountholders, and others. The Defendants also continued to approve BRSB's CRE growth in CRE loans and increased its significant overconcentration risk in a way that far surpassed the concentration in these types of loans at other similarly-sized banks. In 2006, 2007 and 2008, the Bank's CRE loans as a percentage of total capital surpassed its peer group average by a wide margin.

28.     BRSB's quarterly Thrift Financial Reports, Consolidated Reports of Condition and Income, and Uniform Bank Performance Reports (collectively, "Reports"), which were available to the Defendants, prior to and during the time period in which the Loss Transactions were made, confirmed that BRSB's CRE loans represented no less than 600% of total capital, and as much as 785% of total capital, during the time period in which all of the Loss Transactions were approved. BRSB's CRE concentration was consistently more than double the regulatory threshold deemed to constitute a significant CRE concentration risk. Compared to its peer banks, BRSB's CRE concentration exceeded the 96th percentile throughout this time period.

29.     This information was publicly available and readily accessible to the Defendants, both of whom had a duty to read and review the Bank's Reports before approving loans, and to determine the reason for significant variances in the Bank's loan concentrations when compared to its peer group.

8

30.     Although the Defendants were or should have been aware that the Bank's CRE loan concentration far exceeded the triggers for special attention and were regularly provided with information of key economic indicators, such as downward trends in the real estate market, the Defendants did not take sufficient action to limit CRE loan exposure, develop and implement plans to reduce or mitigate concentration risks, or curb or curtail further CRE lending.  Instead, the Defendants continued to approve high-risk and speculative CRE loans, including the Loss Transactions.  As a result, the Bank's adversely-classified assets, for which there is a risk of non-payment, nearly quadrupled as a percentage of total capital and reserves from 24.7% in 2006 to 90.5% in 2008, with CRE loans comprising a substantial percentage of those assets.

31.     The Defendants knew or should have known that concentrating a loan portfolio in CRE loans substantially increases a bank's risk for numerous reasons, including the well-known principles that: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the real estate and housing markets, in particular, are cyclical by nature; (c) the primary source of repayment for these types of loans is the cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE concentrations.  In short, concentrations of CRE loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices and concentration ratios.

32.     Despite the previously discussed warnings and these known risks, Defendants continued to approve deficient loans, including the Loss Transactions with, among other things: (a) excessive or miscalculated LTV ratios; (b) incomplete, inaccurate, or inadequate borrower financial information; (c) missing or inadequate financial project analysis; (iv) incomplete,

inaccurate, outdated, or missing appraisal information; and (v) inadequate action and workout plans for dealing with problem loans.

**B.      Loan Regulations and Guidance**

33.      The FDIC, as required by 12 U.S.C. § 1831p-1, has established safety and soundness standards which apply to all insured banks.  These standards, Appendix A to 12 C.F.R. Part 364, "*Interagency Guidelines Establishing Standards for Safety and Soundness*," prescribe operational and managerial standards for, among other things: internal controls; loan documentation; credit underwriting; asset growth; and asset quality.  During the time period that it operated as BRSB's federal regulator, the OTS had established identical safety and soundness standards in Appendix A to 12 C.F.R. Part 570.  These standards provide:

a.      as to internal controls, that there is (i) an organizational structure that establishes clear lines of authority and responsibility for monitoring adherence to established policies, (ii) effective risk assessment and (iii) compliance with applicable laws and regulations;

b.      as to loan documentation, that loan documentation practices allow an institution to (i) make informed lending decisions and assess risk as necessary on an ongoing basis, (ii) identify the purpose of a loan and assess the ability of a borrower to repay the indebtedness in a timely manner, and (iii) demonstrate appropriate administration and monitoring of a loan;

c.      as to credit underwriting, that an institution's prudent credit underwriting practices (i) are commensurate with the types of loans the institution will make, (ii) consider the nature of the markets in which loans will be made, (iii) provide for consideration, prior to credit commitment, of the borrower's overall financial conditions

10

and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral and the borrower's character and willingness to repay as agreed, and (iv) take adequate account of concentration of credit risk;

       d.      as to asset growth, an institution's asset growth should be prudent and consider any increase in credit risk as a result of growth and the effect of growth on the institution's capital; and

       e.      as to asset quality, that an institution maintain a system commensurate with its size and the nature and scope of its operations to identify problem assets and prevent deterioration in those assets, and specifically to estimate the inherent losses in those assets and establish reserves that are sufficient to absorb estimated losses and consider the size and potential risks of material asset concentrations.

34.     The FDIC, as required by 12 U.S.C. §1828(o), has prescribed standards for real estate lending to be used by insured banks which require insured state banks to adopt and maintain written policies that establish appropriate limits and standards for extensions of credit that are secured by liens on or interests in real estate or that are made for the purpose of financing permanent improvements to real estate. These policies must establish loan portfolio diversification standards, prudent underwriting standards, including loan-to-value limits that are clear and measurable, loan administration procedures for the bank's real estate portfolio, and documentation, approval, and reporting requirements to monitor compliance with the bank's real estate lending policies. *See* 12 C.F.R. § 365.2. During the time period that it operated as BRSB's federal regulator, the OTS prescribed identical standards for real estate lending. *See* former 12 C.F.R. § 563.101 (57 Fed. Reg. 62901, Dec. 31, 1992).

35.     These standards, Appendix A to Subpart A of 12 C.F.R. 365, "*Interagency Guidelines For Real Estate Lending Policies*," directs that the institution should consider both internal and external factors in formulating its loan policies, including:

      a.      the size and financial condition of the institution;

      b.      the expertise and size of the lending staff;

      c.      the need to avoid undue concentrations of risk; and

      d.      market conditions.

36.     The *Interagency Guidelines For Real Estate Lending Policies* identify the market supply and demand factors that should be considered, including:

      a.      demographic indicators, including population and employment trends;

      b.      current and projected vacancy, construction, and absorption rates; and

      c.      economic indicators, including trends and diversification of the lending area.

37.     The *Interagency Guidelines For Real Estate Lending Policies* identify the underwriting standards that should be included in a bank's loan policy, including:

      a.      the capacity of the borrower, or income from the underlying property, to adequately service the debt;

      b.      the value of the mortgaged property;

      c.      the overall creditworthiness of the borrower;

      d.      the level of equity invested in the property;

      e.      any secondary sources of repayment;

      f.      any additional collateral or credit enhancements, such as guarantees;

      g.      loan-to-value limits by type of property;

h.      for development and construction projects and completed commercial properties, requirements for feasibility studies;

i.      minimum requirements for initial investment and maintenance of hard equity by the borrower (cash or unencumbered investment in the underlying property);

j.      minimum standards for net worth, cash flow, and debt service coverage of the borrower or underlying property;

k.      standards for the acceptability of and limits on non-amortizing loans;

l.      standards for the acceptability of and limits on the use of interest reserves;

m.     re-leasing and pre-sale requirements for income-producing property;

n.      pre-sale and minimum unit release requirements for non- income-producing property loans; and

o.      requirements for takeout commitments.

**C.     The Bank's Loan Policy and Loan Approval Process**

38.     The loan approval process is a bank's foremost means to control loan quality and maintain the integrity of a bank's loan portfolio. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit, collateral, and repayment sources at origination.

39.     The Bank revised its Loan Policy on November 17, 2005, and made subsequent revisions to the Loan Policy on or about April 24, 2006, May 1, 2006, June 26, 2006, July 24, 2006, August 28, 2006, February 5, 2007, June 4, 2007, July 30, 2007, August 6, 2007, August 27, 2007, November 26, 2007, January 28, 2008, April 28, 2008, June 5, 2008, and November

13

24, 2008. The Bank also made revisions to the Loan Policy in December 2008, June 2009, and August 2010.

40.    The Bank recognized that adherence to its Loan Policy was critical, stating in its Loan Policy that "a sound loan portfolio is a desirable and profitable means of employing funds available for investment" and that failure to comply "with the contents of the Loan Policy Manual and to adhere to all directives contained therein, particularly those addressing approval processes and required documentation" would be cause for "disciplinary action or termination." *See* Loan Policy §§ 1, 6.

41.    Accordingly, the Bank's Loan Policy provided requirements and guidelines for, among other things, portfolio limitations, loan documentation, underwriting, analysis of borrowers' and guarantors' financial conditions, loan-to-value ratios, appraisals, and characteristics of desirable and undesirable loans. Some of these material provisions in place at the time of the approvals of the fourteen Loss Transactions are described below.

42.    Prior to July 24, 2006, the Loan Policy provided that BRSB's portfolio of "Construction" loans, consisting of "Speculative Construction" and "Non-Speculative Construction" loans, was limited to "less than 200% of risk-based capital." Effective July 24, 2006, the Loan Policy was amended to increase the available limit for BRSB's portfolio of "Construction" loans to "less than 500% of risk-based capital." *See* Loan Policy § 1. In violation of that provision and prudent lending practices, the Defendants approved the Loss Transactions with the knowledge that, at the time of their approval, those loans were in excess of the Loan Policy's portfolio limitation.

43.    The Loan Policy required that the loan officer submit the following as part of a "full documentation loan package" to the Loan Committee: (1) loan approval sheet ("LAS"); (2)

loan documentation checklist; (3) loan application; (4) sales contract/offer to purchase; (5) appraisal; (6) construction cost breakdown, if applicable; (7) credit report; (8) verification of employment; (9) two prior years' W-2 forms, two most recent pay stubs, and two prior years' tax returns with all attached schedules; (10) debt-to-income worksheet; (11) credit memorandum ("CM") providing an overview of the borrower(s), guarantor(s), sources/uses of funds, repayment sources, strengths and weaknesses of credit, and total credit exposure; (12) personal cash flow coverage worksheet; and (13) global cash flow workbook. *See* Loan Policy §§ 6-7.

44.      The Loan Policy stated that BRSB would accept "alternative documentation" in the form of "twelve months bank statements that show proof of reoccurring deposit transaction history in an account" to estimate borrower and/or guarantor annual income on a "limited," "case-by-case basis." *See* Loan Policy § 6.  The Loan Policy cautioned: "When analyzing [bank statements], watch for sizable variances in the month-to-month deposits; and assess if the monthly deposits and withdrawals equal." *Id*.  As discussed in Section IV(E) below, the Defendants approved CRE loans, including nine of the fourteen Loss Transactions, based on "alternative documentation" as a matter of routine practice rather than as a limited exception to full documentation underwriting.  The section permitting "alternative documentation" underwriting was removed from the Loan Policy in approximately November 2008, after all of the Loss Transactions were approved by the Defendants.

45.      The Loan Policy permitted "Stated Income/NIQ [Non-Income Qualifying]" loans on a limited basis and as an "Exception to Policy".  *See* Loan Policy § 6.  However, the loan amount could not exceed $200,000 and CRE loans could "not be done as Stated Income/NIQ loans." *Id*.

46.     The Loan Policy required that all credit requests "must be supported by current and satisfactory financial information as detailed in this policy manual." *See* Loan Policy § 4. The Loan Policy explained that "[a]nalysis of this information is imperative in order to identify repayment capacity of the borrower" and "any guarantors" of the debt. *Id.* The Loan Policy required "current and satisfactory financial statements (including balance sheet and income statement) … for all new loans." *Id.* at § 6. The Loan Policy provided that "satisfactory data must accompany balance sheet information to support current market value of major assets shown" and "[t]he borrower should always provide a total amount of contingent liabilities." *Id.* The Loan Policy further provided that "collateral is normally taken as a secondary source of repayment for the debt and is not a substitute for analysis of [borrower/guarantor] financial position and repayment capacity." *Id.* at § 4.

47.     The Loan Policy stated that "[a]n essential part of the underwriting process is an accurate, timely, and objectively derived appraisal of the real property and other assets comprising the … loan security." *See* Loan Policy § 5. The Loan Policy required that the appraisal be reviewed by the Loan Committee prior to their approval of a loan. *See id.* at §§ 5-7, 10. "Appraisals ordered for, or prepared for a borrower [could] not be used to support a federally regulated transaction." *See id.* at § 5.

48.     The Loan Policy emphasized the importance of "hard equity" and stated that the loan officer "[m]ust identify and document source of hard equity on the [LAS]" prior to approval. *See* Loan Policy § 6. At the time the Defendants approved the first Loss Transaction in December 2005, the Loan Policy stated that there were "minimum requirements for initial investment and maintenance of hard equity by the borrower (i.e. cash, unencumbered investment and/or subordination of property)," but the Loan Policy did not specify what those minimum

16

requirements were. *Id*. at § 6, Exhibits A and B. However, the Defendants represented to the OTS prior to December 2005 that a minimum of 15% equity would be required for all speculative construction and development loans. The Loan Policy was amended, effective November 26, 2007, to state: "All Development Loans require minimum of 20% cash injection or other collateral of equal value." *Id*. at § 6, Exhibit A. The Loan Policy was subsequently amended, effective January 28, 2008, to state: "Lot Loans made to Builders for future Speculative Construction will require 10-20% equity." *Id*. The Loan Policy was further amended, effective June 5, 2008, to state: "All Speculative Construction loans will require 15% of the total costs for the cash down payment." *Id*.

49. The Loan Policy provided "additional underwriting criteria unique to commercial real estate loans … to be used in conjunction with the general guidelines contained in other portions of this Loan Policy Manual." *See* Loan Policy § 10. The Loan Policy stated that "undesirable loans" included "[l]oans for the purchase of land carried for speculative purposes, without definite plans for ultimate disposition, and/or lack of a definite repayment plan" and "[l]oan[s] secured by a second or other junior deed of trust on any commercial property." *Id*.

50. The Loan Policy required that the loan package for CRE and commercial loans presented to the Loan Committee analyze, among other things, the economy/market, credit, take-out commitments, minimum hard equity, and cash flow. *See* Loan Policy § 10. With respect to the economy/market, the Loan Policy required consideration of the "[i]ndustry outlook in relation to national and local economy," population and employment in the market, existing property values in the market, general analysis of the remaining and proposed inventory, and ongoing and proposed development for the market. *Id*. With respect to credit, the Loan Policy required analysis of: "Borrower's … expertise [and] experience"; "previous projects … of the

borrower"; "all ongoing projects of the borrower and current status of same"; "[c]urrent and complete financial information for borrower, guarantors, and related entities"; "[f]inancial history with the Bank"; "[a]ppraisal"; and "[s]trengths, weaknesses, and recommendations." *Id*. With respect to take-out commitments, the Loan Policy stated that "[p]rior to approval of any construction project on commercial real estate, the borrower must be qualified for permanent financing with the bank (which should be evidence[d] on the loan presentation) or either have in his possession a written commitment for permanent financing from an acceptable lender." *Id*. With respect to cash flow, the Loan Policy stated that "[t]he minimum acceptable cash flow coverage for a commercial loan is 1.25 [to] 1." *Id*.

51. The Loan Policy provided supervisory LTV limits. The LTV limit was set at 65% for purchase of raw land; 70-75% for land development (depending upon borrower/guarantor credit score), and 65-80% for speculative construction loans (also depending upon credit score). *See* Loan Policy § 6, Exhibit B. The LTV limit was set at 65-85% for commercial and non-speculative, residential construction loans (depending upon credit score). *Id*. at §§ 6-7 and 10, Exhibit A. The LTV limit was set at 65-80% for Stated Income/NIQ loans (depending upon credit score). *Id*. at § 6, Exhibit A.

52. The Loan Policy provided that "[a]ny exceptions to the requirements contained herein must be … noted on the 'Exception Approval Form.'" *See* Loan Policy §§ 6 and 10.

53. The Loan Committee was "on call" and did not meet on a regularly scheduled basis to review the Bank's lending activities. The Loan Policy did not require Board approval of loans; approval authority was delegated to the three-person Board-created Loan Committee composed of the Chairman of the Board (Defendant Taylor), the President (Defendant Wiseman), and the Bank's Chief Credit Officer (Wood). *See* Loan Policy § 3. The Loan

Committee was responsible for approval of all new and renewal loan requests, and there was no limit on the Loan Committee's lending authority during the time the Loss Transactions were approved. After all of the Loss Transactions were approved, the Loan Policy was amended to require that loans over $1 million be approved by the Board. Prior to that time, the Board did not approve any loans, having delegated that function to the Loan Committee. A majority vote of the Loan Committee members was required to approve a loan.

54.     Contrary to prudent lending practices, the Defendants did not require that minutes be kept of the Loan Committee's meetings during the time period when all of the Loss Transactions were approved.

55.     All fourteen Loss Transactions were approved by both Defendants.

**D.     Loan Underwriting Violations and Deficiencies**

56.     As detailed herein, substantial losses were sustained by reason of the Defendants' negligent and grossly negligent departures from safe and sound banking practices. Both Defendants repeatedly negligently and/or grossly negligently disregarded numerous warnings discussed in Section IV(A) above and the Bank's Loan Policy, and approved loans involving: disregard for the Bank's basic loan approval processes; violations of the Bank's LTV policies; failure to obtain collateral appraisals or adequate collateral appraisals; failure to perform cash-flow or borrower/guarantor financial analysis; failure to analyze the economic feasibility of projects proposed for funding; inadequate or inadequately-valued collateral; borrowers who were not creditworthy or who had provided inadequate financial information; projects that involved insufficient collateral and guarantees for repayment; projects that purported to be dependent on the sale of developed property for repayment of the loan, but which did not extend sufficient

funds to finance the anticipated development; and failures to account for known weaknesses or unfavorable trends in CRE lending and the relevant markets.

57. Between at least December 5, 2005 and September 11, 2008, the Defendants repeatedly engaged in a pattern and practice of approving loans that: (1) violated the Bank's Loan Policy, including, without limitation, the policy provisions set out above; (2) evidenced systematic deficiencies in the Bank's underwriting and approval processes; and (3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards and the real estate lending standards discussed in Section IV(B) above.

### E. The Fourteen Loss Transactions

58. For each of the Loss Transactions, the Defendants were negligent and grossly negligent and breached their fiduciary duties, in violation of the Bank's Loan Policy, applicable rules and regulations, and prudent banking practices.

59. The documentation of the Loss Transactions, including the CM and LAS presented to and approved by the Loan Committee, showed that the information was insufficient to support any informed or reasonable decision to approve the proposed loans and/or that the Loss Transactions violated the Bank's Loan Policy, regulatory laws, regulations and standards, and principles of prudent lending. This documentation also shows that the Defendants' decisions to approve the Loss Transactions were not a product of a rational process and the Defendants did not avail themselves of all material and reasonably available information. As a result, the Defendants are not shielded from liability on the negligence and breach of fiduciary claims by the business judgment rule.

60.     Each of the Loss Transactions violated the Bank's Loan Policy in numerous respects and illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that both Defendants committed that resulted in losses and that constitute negligence, gross negligence, and breaches of fiduciary duties, either separately or together as a pattern or practice.

61.     All of the Loss Transactions, which were originated prior to September 12, 2008, defaulted within three years before BRSB's failure. Thus, the date(s) of the substantial injuries alleged in this suit or the date(s) that such injuries became reasonably ascertainable were all within three years prior to the date the Bank failed. In addition, and in the alternative, the statute of limitations also was tolled under the doctrine of adverse domination with respect to the Loss Transactions because they were approved by Defendants Taylor and Wiseman who, along with Taylor's wife, made up a majority of the Board from around October 2008 until the Bank's failure on October 14, 2011, starting less than three years after the Defendants' approval of the first Loss Transaction on December 5, 2005. The statute of limitations also was tolled under the doctrine of adverse domination because Defendants Taylor and Wiseman were owners of 99.9 percent of the Bank's common stock and completely dominated BRSB during the relevant time period. Under North Carolina law, the limitations period is tolled as long as a bank is dominated by the same wrongdoers against whom a cause of action exists. Only when a new entity takes control of the bank, be it a receiver or new board of directors, can suit against the wrongdoers be brought as a practical matter. Taylor's wife was not a "disinterested director" for purposes of applying the doctrine of adverse domination under North Carolina law because she would not have sued (and did not sue) her husband in an action contrary to her own interests.

21

1. **The REB and MRB Loan[1]**

62.     In December 2005, Defendants Taylor and Wiseman approved a $540,000 loan to REB and MRB to purchase a "restaurant/bar" in Maggie Valley, North Carolina. The loan was secured by a first deed of trust and an assignment of rents on the acquired property. At the time of the loan request, REB operated a bar directly across the street from the business to be purchased. That bar's lease in the building in which it operated was set to expire in February 2006. MRB, who was REB's son, lived in Florida.

63.     The CM for this loan consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this loan. The CM listed a weakness of credit for this loan as "failure rate high on restaurants."

64.     The LAS stated that this loan was underwritten as a "full" documentation loan. The primary source of repayment listed in the CM was "Food/Beverage Sales" of the business to be purchased. The CM provided no details to support the statement that those sales would be sufficient to repay the loan. A separate "income projections" document prepared by REB, which provided estimates regarding anticipated cover charges and alcohol, food and merchandise sales for the business to be purchased "based on being open 6 nights a week, 4.3 weeks in [each] month," also did not support the loan. Those estimates were not verified and no profit and loss statements or balance sheets for the business to be purchased were provided. In violation of the Loan Policy, the Defendants did not analyze "current and satisfactory financial information" to be able to determine whether those estimated sales were, in fact, an accurate and viable primary source of repayment for the loan. Also in violation of the Loan Policy, the Defendants did not

_____

[1]     The names of individual borrowers and guarantors are abbreviated herein in order to avoid unnecessary disclosure of personally identifiable information. Those names will be provided to the Defendants once an appropriate protective order is in place.

require or review any credit analysis of REB's prior bar operation to determine whether REB had the necessary experience and expertise to successfully operate the business to be purchased.

65. In further violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval of the loan. Had the Defendants reviewed the appraisal prior to their approval, as required, they would have been aware that the value of the business to be purchased and the actual LTV% for this loan were inflated, and "Food/Beverage Sales" were not a viable source of repayment for the loan. The comparables used in the appraisal were dramatically different properties, both in terms of the size of the buildings and the types of commercial businesses operated. Two of the four comparables, which were between one and a half and three years old, were outdated. The appraisal stated that the majority of the businesses in the area were "tourist oriented" and operated on a "seasonal basis May through October". The appraisal noted that Maggie Valley was sparsely populated, with only 607 residents in 2000. Incredibly, REB's "income projections" estimated that the business would operate six nights a week, year round, and that 380 people, including nearly 100% of the alleged customers of REB's prior bar, would frequent the business every Friday and Saturday night. In violation of the Loan Policy, the Defendants did not analyze the negative impact that the small local population and seasonal market would have on the repayment of the loan.

66. The secondary source of repayment listed in the CM was "outside job income from [borrower MRB]." In further violation of the Loan Policy, the Defendants did not require or analyze MRB's "2 most recent paystubs" to be able to project his 2005 income. The borrowers' personal financial statements also reflected substantial liabilities and insufficient liquidity to repay the loan.

67. As a direct and proximate result of the negligent and grossly negligent approval of

this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $528,000 were sustained.

### 2. The J Poplar Ridge Loan

68. In May 2006, Defendants Taylor and Wiseman approved a $1.484 million loan to J Poplar Ridge, LLC ("J Poplar") to purchase a lot in the Poplar Ridge subdivision in Asheville, North Carolina for $289,000, reimburse the seller for prior site preparation on that lot totaling $82,750, and build a spec home on that lot. The loan was secured by a first deed of trust on the lot to be purchased.

69. The Defendants approved this loan on May 5, 2006, before the loan officer had even prepared his May 10, 2006 CM. The CM was a required part of the loan package presented to the Loan Committee, and it should have provided critical underwriting details, including an overview of the borrower/guarantors, uses of loan funds, repayment sources, weaknesses of credit, and total exposure. The Defendants' approval of this loan prior to their receipt and analysis of the CM was in violation of the Loan Policy and prudent lending practices. Had the Defendants analyzed the CM prior to their approval, as required, they should have recognized the CM and loan's obvious deficiencies.

70. The CM stated that the primary and secondary sources of repayment for the loan were "sale of the completed project" and "direct support from normal income and existing assets of the guarantor," respectively. The CM listed two weaknesses of credit for this loan as: "1. The spec home project is within a high end subdivision with limited affordability among the general population [and] 2. The construction project has been underway via a different construction company." The CM described the guarantor as a "member manager of twenty nine business entities." In violation of the Loan Policy, the CM did not provide, and the Defendants did not analyze, the ownership of those business entities or the current status of their related

24

development projects. The space on the CM where "spec loan(s) through other lender(s)" should have been listed was left blank. The CM stated that the seller of the lot, who also was the developer of the Poplar Ridge subdivision, was taking "an extended vacation from his construction business." The CM did not discuss, and the Defendants did not analyze, what impact the seller's "extended vacation" would have on the build-out of that subdivision.

71. The LAS stated that this loan was underwritten as a "full" documentation loan. No financial information was provided regarding J Poplar, a newly formed entity. The Loan Policy required that two prior years' tax returns for the guarantor be submitted to the Loan Committee as part of the loan package. In violation of that provision and prudent lending practices, the loan file contained only an unsigned copy of what may have been the guarantor's filed 2004 federal tax return and a draft of the guarantor's 2005 federal tax return. A separate personal cash flow coverage worksheet in the loan file stated that the guarantor had $1.2 million in other bank debts at the time of approval. In violation of the Loan Policy, the Defendants did not analyze the guarantor's personal financial statement or the extent to which additional contingent liabilities existed regarding the guarantor's other businesses. The guarantor's personal financial statement, received by BRSB after the Defendants' approval of the loan, listed an additional $10 million in guarantor debts, no retirement funds, and limited liquidity. Without "current and satisfactory financial information," the Defendants could not evaluate whether the guarantor's "normal income and existing assets" were a legitimate secondary source of repayment for the loan.

72. The LAS provided a $1.484 million cost estimate (100% loan-to-cost ("LTC")) to build the spec home, but no signed construction cost estimate was required or otherwise

25

submitted to the Defendants prior to their approval, as required by the Loan Policy, to support that estimate.

73.     In further violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval.  Had the Defendants reviewed the appraisal prior to their approval, as required, they would have recognized that the appraisal had inflated the value of the home to be built and the actual LTV% for this loan.  One of the comparables used was stale, having sold nearly one year prior to the appraisal date.  Five of the six comparables used were located several miles from the collateral, in subdivisions which did not have the developer taking an "extended vacation" like in Poplar Ridge.  In its "Additional Comments" section, the appraisal acknowledged that the higher appraised value was out of step with the "fair market value tha[t] is predominate in its area."

74.     The Loan Policy emphasized the importance of "hard" equity for CRE loans. Despite their prior representation to the OTS that a minimum of 15% equity would be required for all speculative construction and development loans, the Defendants did not require a 15% equity contribution from the borrower or guarantor for this loan.

75.     As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $360,000 were sustained.

### 3.     The W3 Properties Loan

76.     In June 2006, Defendants Taylor and Wiseman approved a $2 million loan to W3 Properties, LLC ("W3 Properties") to purchase a lot on Johns Island, South Carolina, and build a spec home on that lot.  The loan was secured by first mortgages on the lot on which the home would be built and on eight additional lots in the Providence Square subdivision in Simpsonville, South Carolina.

77.     The CM for this loan consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this loan. The CM listed three weaknesses of credit for the loan as: "1. Rising … interest [rates] could slow lot sales …; 2. Increasing building material and labor costs; [and] 3. Managing property from out of town."

78.     The primary and secondary sources of repayment listed in the CM were "perm[anent] loan" and "sale of asset," respectively. The Loan Policy required "[p]rior to approval … [that] the borrower must be qualified for permanent financing with the bank (which should be evidence[d] on the loan presentation) or either have in his possession a written commitment for permanent financing from an acceptable lender." In violation of that provision, the Defendants did not require that the borrower qualify or otherwise have a commitment letter for permanent financing on the home to be built prior to their approval.

79.     The home to be built was outside of BRSB's market area. At the August 28, 2006 Board meeting, Defendant Wiseman reported that BRSB "is watching large spec construction and is not doing 'out of market' loans." This out-of-market, speculative construction loan, approved by the Defendants only two months earlier, contradicts Defendant Wiseman's representation to the Board.

80.     The Defendants approved this loan based on inadequate appraisals. The appraisal for the home to be built relied on comparables with adjusted sales prices well in excess of acceptable levels, a clear indication that the appraisal had significantly overvalued the subject property. The second appraisal for the eight additional collateral lots in Providence Square subdivision also was deficient. That second appraisal provided a total valuation for all eight lots by multiplying the appraised value of one, uniquely desirable lot in the subdivision, by eight.

27

That flawed methodology ignored the lot's unique superior features, as well as absorption period and operating expenses while the lots would be marketed for sale.

81.     The LAS stated that "alternative documentation" was used to underwrite this loan. No financial information regarding the borrowing entity was analyzed by the Defendants. No tax returns or W-2s were required of the three guarantors. Instead, the Defendants relied on 12 months of deposits into three bank accounts to estimate the guarantors' annual income. Those bank account statements offered no proof of actual income, much less re-occurring income, and to have relied on such statements was contrary to prudent lending practices. With respect to one joint bank account in the name of guarantor WTW and his wife, no determination was made whether any of the deposits into that account reflected his wife's separate income (she was not a guarantor on the loan). With respect to a second bank account in the name of non-borrower/guarantor W Properties, which account was attributed to guarantor TJW, no determination was made regarding the ownership of that company/account or the source of the deposits into that account. Financial information in the loan file, received after approval, confirmed that the guarantors' actual combined income in 2006 was less than 20% of the "alternative documentation" annual income estimate used to underwrite the loan. The guarantors' personal financial statements did not indicate that they had sufficient financial strength to repay this loan.

82.     Despite the Loan Policy's emphasis on the importance of "hard" equity for CRE loans and the Defendants' prior representation to the OTS that a minimum of 15% equity would be required for all speculative construction and development loans, the Defendants did not require a 15% equity contribution from the borrower or guarantors for this loan.

83. The deficient underwriting of this loan was heavily criticized by outside loan reviewer, Credit Risk Management, LLC ("CRM"), in its February 2010 External Loan Review Report ("CRM Report"). The CRM Report's specific criticisms of this loan included: (1) "equity in" was deemed "inadequate" because the "Bank financed 100% of the construction costs"; (2) "initial underwriting" was deficient because it "contain[ed] no valuable detail"; (3) the loan file contained no borrower background; (4) borrower tax returns were not in the loan file; and (5) the use of the appraised value of one collateral lot in Providence Square to calculate the value of eight collateral lots therein was inappropriate.

84. A December 22, 2008 BRSB loan workout worksheet in the loan file admitted in the "Root Cause of Problem" section of the worksheet that this loan was "[n]ot properly underwritten to standard at [the] time of loan [origination]."

85. As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $830,000 were sustained.

### 4. The RBB and CSB Loan

86. In June 2006, Defendants Taylor and Wiseman approved an $800,000 line of credit to RBB and CSB to build homes in a subdivision development. This line of credit paid off an existing $400,000 line of credit established in June 2004, and provided $400,000 in new funds to the borrowers. The line of credit was secured by a first deed of trust on 20 lots in the Dogwood Trials subdivision in Maggie Valley, North Carolina.

87. The CM consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this line of credit. The primary source of repayment listed in the CM was "lot sales" in the Dogwood Trials subdivision. In violation of the Loan Policy, the Defendants did not analyze the current status of construction,

or the total number of lots sold, in that subdivision. A separate undated CM in the loan file for the borrowers to build a spec home in the same subdivision listed three credit weaknesses as: "1. No life insurance; 2. No retirement; [and] 3. Slowing housing market." The Defendants knew or should have known of each of these weaknesses in June 2006 when they approved this increased line of credit.

88.     In further violation of the Loan Policy, no appraisals of the collateral were received or reviewed by the Defendants prior to their approval. Had the Defendants reviewed the appraisals prior to their approval, as required, they would have been aware that the appraisals had significantly inflated the value of the lots and the actual LTV% for this line of credit. The first appraisal estimated a "typical view lot" in the subdivision to be worth $80,000 using a sales comparison approach. However, two of the three comparables used from the same subdivision had been sold three days prior to the appraisal for only $61,500 each. A second appraisal of the same collateral lots, dated the same day as the first appraisal and prepared by the same appraiser, noted that the appraiser had determined "gross sales price potential for the vacant lots without consideration to the sales cost during the sellout period [and] [n]o discounted cash flow analysis was prepared per lender request." Inexplicably, the first appraisal stated the average lot size in the subdivision was 0.41 acres, while the second appraisal stated the average lots size in the same subdivision was only 0.37 acres. The appraisals also were assigned to BRSB by the borrowers, in violation of the Loan Policy requirement that "[a]ppraisals ordered for, or prepared for, a borrower cannot be used to support a federally regulated transaction."

89.     The secondary source of repayment listed in the CM was "sale of other free and clear real estate," but the CM did not identify any such real estate. The LAS stated that "alternative documentation" was used to underwrite this line of credit. The Defendants relied on

unsigned cover pages of HUD-1 settlement statements from four alleged prior sales of homes in the same subdivision to estimate the borrowers' annual income. To rely on those unsigned cover pages was contrary to prudent lending practices and also violated the Loan Policy's "alternative documentation" requirement that 12 months of bank statements were needed to estimate annual income. The borrowers' financial statement confirmed that they lacked liquidity, had no retirement funds, and had substantial liabilities.

90. As a direct and proximate result of the negligent and grossly negligent approval of this line of credit by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $400,000 were sustained.

### 5. The Kingdom Builders Loan

91. In August 2006, Defendants Taylor and Wiseman approved a $215,000 loan to Kingdom Builders of the Carolinas, LLC ("Kingdom Builders") to purchase a lot in the Providence Downs South subdivision in Waxhaw, North Carolina for future spec construction. The loan was secured by a first deed of trust on the vacant lot to be purchased.

92. The CM stated that the primary source of repayment for the loan was a "construction loan for new spec when the [guarantors] decide to start building on this lot." In violation of the Loan Policy, the Defendants did not analyze where the borrower would acquire financing for that construction, the type of home expected to be built, or when such construction was expected to begin. The Loan Policy cautioned that "undesirable loans" included loans such as this "for the purchase of land carried for speculative purposes, without definite plans for ultimate disposition." The CM listed a weakness of credit for the loan as "[p]rimary repayment is starting a spec loan which has not been approved."

93. The secondary sources of repayment listed in the CM were "1) Ability to carry debt, [and] 2) Collateral value." The CM and LAS stated that "alternative documentation" was

31

used to underwrite this loan. No financial information regarding the borrowing entity, formed less than two years prior to loan approval, was analyzed by the Defendants. In violation of the Loan Policy, the Defendants did not analyze the current status of the Providence Downs South subdivision, despite the fact that BRSB already had substantial exposure to that subdivision through other borrowers. No tax returns or W-2s were required from the guarantors. Instead, the Defendants relied on 12 months of deposits into two bank accounts to estimate the guarantors' annual income. Those bank account statements offered no proof of actual income, much less re-occurring income, and to have relied on such statements was contrary to prudent lending practices.

94. The CM listed two additional weaknesses for the loan as "fair liquid asset position by guarantors" and "[guarantors] have only been in this business for 17 months." The CM stated that the guarantors had been business partners for less than two years and had only recently sold their first spec home. The guarantors' personal financial statements confirmed that they lacked liquidity and had substantial liabilities. Both guarantors also claimed the full balance of the same money market account as their own individual asset, further inflating their financial condition.

95. In violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval. Had the Defendants reviewed the appraisal prior to their approval, as required, they would have confirmed that the loan's 90% LTV significantly exceeded the 65% LTV limit set by the Loan Policy for the purchase of raw land. However, even before receipt of the appraisal, the CM listed an additional weakness for the loan as "High LTV," clearly demonstrating that the Defendants knew or should have known at the time of their approval that the loan's LTV would violate the Loan Policy.

32

96. Despite the Loan Policy's emphasis on the importance of "hard" equity for CRE loans and the Defendants' prior representation to the OTS that a minimum of 15% equity would be required for all speculative construction and development loans, the Defendants did not require a 15% equity contribution from the borrower or guarantors for this loan. The "inadequate" amount of equity and the excessive LTV for this loan were specifically criticized in CRM's Report.

97. As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $140,000 were sustained.

### 6. The M Companies Loan

98. In December 2006, Defendants Taylor and Wiseman approved a $1.4 million loan to The M Companies, LLC ("M Companies") to purchase a lot in Charlotte, North Carolina, and build a spec home on that lot. The loan was secured by a first deed of trust on that lot.

99. The CM for this loan consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this loan. The "Overview of Borrowers" section of the CM simply stated: "See attached company/personal description." The attachments referenced were a few pages from the Winter 2005-2006 edition of "Today's Custom Homes" magazine and some borrower marketing materials. Those materials stated that the borrower had been building homes since 1990. However, other documents in the loan file showed that the borrower was not formed until eleven years later in 2001. Those materials did not provide sufficient information for the Defendants to evaluate whether the borrower and guarantors had the necessary experience and expertise to build the proposed spec home. The CM listed a weakness of credit for this loan as "rising interest rates."

100. The primary and secondary sources of repayment listed in the CM were "sale of asset" and "[refinance] with perm loan." With respect to the secondary source of repayment, in violation of the Loan Policy, the Defendants did not require that the borrower qualify for permanent financing with BRSB or another "acceptable lender" prior to their approval of this loan.

101. The loan file indicated that the borrower first sought financing for this spec project with Builders First Holdings, Inc. ("Builders First"). The CM and LAS did not discuss why Builders First declined to fund the loan, and the Defendants did not examine any details regarding that prior funding request. The Loan Policy required that the Defendants review "all ongoing projects" of the borrower and guarantors, and the current status of the same, prior to loan approval. The CM and a separate underwriting worksheet in the loan file stated that the borrower had five additional spec construction projects, including four projects financed by other banks, ongoing at the time of this loan request. In violation of the Loan Policy, the Defendants did not analyze the current status of those projects prior to their approval of the loan.

102. The LAS listed an estimated 80% LTV for this loan. However, based on the October 26, 2006 appraisal of the home to be built, the Defendants knew or should have known that the loan's actual 94% LTV significantly exceeded the 80% LTV limit set by the Loan Policy for spec home construction based on the guarantors' credit scores.

103. The LAS also listed a 100% LTC for this loan. Despite the Loan Policy's emphasis on the importance of "hard" equity for CRE loans and the Defendants' prior representation to the OTS that a minimum of 15% equity would be required for all speculative construction and development loans, the Defendants did not require any equity from the borrower or guarantors for this loan. The LAS additionally provided a $1.4 million cost estimate

34

to build the spec home, but no signed construction cost estimate was submitted with the loan package to the Defendants prior to their approval, as required by the Loan Policy, to support that estimate.

104.    The LAS stated that "alternative documentation" was used to underwrite this loan. No tax returns, profit and loss statements, or other current financial information regarding the borrowing entity, formed in 2001, were analyzed by the Defendants. No tax returns or W-2s were required of the guarantors. Instead, the Defendants relied on 12 months of deposits into the borrower's business checking account to estimate the guarantors' annual income. Those bank statements offered no proof of actual guarantor income, much less re-occurring income, and to have relied on such statements was contrary to prudent lending practices. The combined cash flow coverage worksheet in the loan file stated that the borrower/guarantors had approximately $5.79 million in outstanding debt. The guarantors' personal financial statements reflected stale, self-valued real estate and business interests, and insufficient liquidity to repay this loan or their significant outstanding debt.

105.    As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $332,000 were sustained.

### 7.    The Vista Views Loan

106.    In December 2006, Defendants Taylor and Wiseman approved a $1.2 million loan to Vista Views, LLC ("Vista Views") to purchase 34 acres of land and develop related infrastructure for 23 lots in the Vistas of Buck Ridge subdivision in Clyde, North Carolina. The loan was secured by a first deed of trust on the land purchased.

107.    The CM for this loan consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this loan. The

35

CM listed three weaknesses of credit for the loan as: "1. Rising interest rates; 2. Real estate 'bubble' could slow sales; [and] 3. Increased labor/material expenses."

108.     The primary and secondary sources of repayment listed in the CM were "sale of lots" and "[refinance] with new construction loans on individual lots."   With respect to the secondary source of repayment, in violation of the Loan Policy, the Defendants did not require that the borrower qualify for permanent financing on the individual lots with BRSB or another "acceptable lender" prior to their approval of this loan.   The CM stated that the guarantors had four outstanding ADC loans, with total commitments in excess of $1.5 million, at the time of approval.   The guarantors' personal cash flow worksheets also listed over $4.8 million in outstanding debts.   The Defendants did not analyze the current status of those ongoing projects or outstanding debts.

109.     In further violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval.   Had the Defendants reviewed the appraisal prior to their approval, as required, they would have been aware that the appraisal had significantly inflated the value of the lots and the actual LTV% for this loan.   The appraisal stated that the "most probable buyer … is a pure investor … who would purchase the property" in its entirety.   The appraisal noted that the fair market value of the property, if sold in its entirety, was actually less than the borrower's contract price to purchase the property.   With respect to its sales comparison analysis for individual lots sales, the appraisal relied on lot sales that were both significantly inferior and superior to the subject lots, and were up to two and a half years old in a "subdivision which was developed also by the [guarantors]."   The appraisal also noted that the borrower's infrastructure cost estimates to develop the lots were "considerably greater than the average infrastructure costs for other subdivisions in Haywood

36

County." The appraisal was assigned to BRSB by the borrower, in violation of the Loan Policy requirement that "[a]ppraisals ordered for, or prepared for, a borrower cannot be used to support a federally regulated transaction."

110. The LAS stated that "alternative documentation" was used to underwrite this loan. No financial information was available for the newly formed borrower entity. No tax returns, W-2s or personal financial statements were required of the guarantors. With respect to four of the six guarantors, the Defendants relied on 12 months of deposits into their personal and business checking accounts to estimate their annual income. Those bank statements offered no proof of actual income, much less re-occurring income, and to have relied on such statements was contrary to prudent lending practices. There also were substantial variances in the month-to-month deposits into those accounts, with no monthly deposits made during seven months in which there were significant withdrawals. Those variances, which the Loan Policy cautioned must be analyzed, cast further doubt that those statements were an accurate reflection of the guarantors' annual income. For the remaining two guarantors, the Defendants relied on HUD-1 settlement statements which reflected prior sales of three properties by those guarantors and a related company. The HUD-1 statements similarly offered no proof of re-occurring income, and reliance on those statements violated the Loan Policy's "alternative documentation" provision that 12 months of bank statements were required to estimate annual income.

111. A December 17, 2008 BRSB loan workout worksheet in the loan file admitted in the "Root Causes of Problem" section of the worksheet that this loan was "not properly underwritten at time of origination."

112.     As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $373,000 were sustained.

### 8.     The L Construction Company Loan

113.     In February 2007, Defendants Taylor and Wiseman approved a $1.35 million loan to L Construction Company, LLC ("L Construction") to purchase a lot and build a spec home in the Providence Downs South subdivision in Waxhaw, North Carolina.  The loan was secured by a first deed of trust on the lot purchased.

114.     The CM for this loan consisted of a one page handwritten document that lacked sufficient information to support any informed or reasonable decision to approve this loan.  The CM listed three weaknesses of credit for the loan as: "1. Wife does not work; 2. No retirement listed; [and] 3. Large home market slowing."

115.     The primary and secondary sources of repayment listed in the CM were "sale of asset" and "[refinance] with perm loan."  With respect to the secondary source of repayment, in violation of the Loan Policy, the Defendants did not require that the borrower qualify for permanent financing on the home to be built with BRSB or another "acceptable lender" prior to their approval of this loan.

116.     In further violation of the Loan Policy, the Defendants did not analyze the current status of the Providence Downs South subdivision in which the spec home would be built, despite the fact that BRSB already had substantial exposure to that subdivision through other borrowers.  The LAS provided a $1.35 million cost estimate to purchase the lot and build the spec home, but no signed construction cost breakdown was submitted with the loan package to the Loan Committee, as required by the Loan Policy, to support that estimate prior to approval.

38

117.    No appraisal of the collateral was received or reviewed by the Defendants prior to their approval.  The appraisal eventually received was assigned to BRSB by the borrower, in violation of the Loan Policy requirement that "[a]ppraisals ordered for, or prepared for, a borrower cannot be used to support a federally regulated transaction."

118.    The LAS stated that "alternative documentation" was used to underwrite this loan. No financial information was provided for the borrower entity, and no tax returns or W-2s were required of the guarantors.  In violation of the Loan Policy, the "alternative documentation" materials, consisting of 12 months of statements in the guarantors' business checking account, were not even received by BRSB until three months after the Defendants had approved this loan. Those checking account statements also offered no proof of actual income, much less re-occurring income, and to have relied on such records would have been contrary to prudent lending practices.  There were substantial variances in the month-to-month deposits into that checking account, with little or no monthly deposits made during several months in which there were significant withdrawals.  Those variances, which the Loan Policy cautioned must be analyzed, cast further doubt that the statements were an accurate reflection of the guarantors' annual income.  The one guarantor personal financial statement in the loan file, also received by BRSB after the Defendants' approval of the loan, confirmed that the guarantor did not have the capacity to repay this loan.

119.    At the February 5, 2007 Board meeting, four days prior to approval of this loan, Defendant Wiseman "reported that he and Chairman Taylor have really tightened down on spec construction and [the] loan committee is really looking at borrower's bank statements and personal financial statements."  That representation to the Board is directly contradicted by the

Defendants' approval of this loan prior to BRSB's receipt of the guarantors' bank statements and personal financial statement.

120.    As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $426,000 were sustained.

### 9.    The Mountain Air Development Loan

121.    In April 2007, Defendants Taylor and Wiseman approved the refinance of a prior $2.5 million loan to Mountain Air Development, Inc. ("Mountain Air") previously used for construction and short term cash flow needs.  This refinance added $500,000 in new funds to make "severe foundation repairs" to townhomes built in the Mountain Air residential development in Burnsville, North Carolina.  The loan was secured by a first deed of trust on three lots and an additional 18 acres with improvements in the development.

122.    The primary sources of repayment for the loan listed in the CM were: "1) As units are sold & 2) E&O insurance proceeds."  The CM listed a weakness of credit for this loan as "[s]ubject to downturn in economy … economy has not been strong."  This identified weakness cast serious doubt on whether the sale of unspecified "units" in the Mountain Air development would even occur.  The CM stated that homeowners in the development had sued Mountain Air, along with "Contractors, Engineers, [and] graders," because of foundation problems.  The CM claimed that all parties sued had E&O insurance, but no details were provided regarding the amount of E&O insurance available and the CM could not legitimately guarantee that the E&O insurance would, in fact, cover the repairs.  Based on the limited information provided, the Defendants could not reasonably conclude that unspecified "unit" sales and "E&O insurance proceeds" were legitimate primary sources of repayment for the loan.

40

123.    The secondary source of repayment for the loan listed in the CM was "[a]bility to carry long term and secured it by guarantors."  However, the CM also listed a second weakness of credit for this loan as "[g]ross amount of debt and negative equity of company."  A January 1, 2007 email in the loan file from the President and CEO of the borrower, who also was a guarantor on the loan, confirmed that the Defendants were aware, prior to their approval, that Mountain Air was experiencing significant financial difficulties: "I have contractors that were supposed to be paid last week and I desperately need to take care of in order for work to continue.  There was no indication from Charles [Taylor] or Dwayne [Wiseman] that the verbal agreement to do the loan was contingent on any more information other than getting appraisal and paperwork in order."

124.    The LAS stated that "full" documentation was used to underwrite the loan.  In violation of the Loan Policy, the Defendants did not analyze any current financial information to determine whether the borrower and guarantors were a viable secondary source of repayment for the loan.  The CM calculated the borrower's income by averaging annual income from 2002 through 2005 and the first 11 months of 2006 (as internally prepared).  By relying on income figures up to five years old, a grossly inaccurate picture of the borrower's current income was presented.  The borrower had significant negative income in 2003 and 2005, and a substantial loss was expected for 2006.  The CM stated that the borrower had $58.5 million in additional outstanding debts with other banks.  Despite these obvious red flags, the Defendants did not analyze Mountain Air's other debts or inquire about the current status of its other development projects.  The financial information provided for the guarantors also was stale and did not support their ability to repay the loan.  In further violation of the Loan Policy, the Defendants did not require or analyze the two prior years' tax returns for any guarantor and did not require

current credit reports on the guarantors. The guarantors' 2006 federal tax returns, provided to BRSB after loan approval, confirmed that each guarantor had substantial negative income in 2006. The actual debt-to-income ratio for this loan also was lower than the "minimum acceptable cash flow coverage" of 1.25 to 1 required by the Loan Policy.

125. The CM listed an 89.6% LTV for this loan which was significantly higher than the 75% and 80% LTV limits set by the Loan Policy for land development and construction, respectively.

126. The Defendants also approved this loan based on inadequate appraisals. The 18 acres of collateral described as the "Reception/Sales Center Administrative Offices & Employee Housing of the Mountain Air Country Club" had little value outside of their use in conjunction with the Mountain Air development. The appraisal of that land noted: "This property is very unique. There have not been any sales of property like the subject …. Also, the property does not generate any income …. [These] improvements would have little use other than for the use they have to the country club property." Given the restricted use of that property, the appraised value of those improvements was substantially inflated, and that collateral should not have been relied on to support this loan. The appraisals for the three lots secured as additional collateral also contained obvious deficiencies. The appraisals for those lots relied on the same three comparables to determine appraised values. Two of the lot appraisals were dated the same date and the third lot appraisal was dated only one month earlier. However, substantially different adjustments and indicated values for each of the three comparable lots were listed in the lot appraisals, casting serious doubt as to the accuracy of those appraisals.

127. As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $500,000 were sustained.

### 10. The B Custom Homes Loan

128. In May 2007, Defendants Taylor and Wiseman approved a $266,223 loan to B Custom Homes, Inc. ("BCH") to purchase a lot in the Providence Downs South subdivision in Waxhaw, North Carolina for future spec construction. The loan was secured by a first deed of trust on the vacant lot to be purchased.

129. In violation of the Loan Policy and prudent lending practices, the Defendants approved this loan on May 21, 2007, before the loan officer had even prepared his May 31, 2007 CM. Had the Defendants analyzed the CM prior to their approval, as required, they should have recognized the CM and loan's obvious deficiencies.

130. The CM stated that the primary source of repayment for the loan was "[n]ew spec loan with BRSB." In violation of the Loan Policy, the Defendants did not require that the borrower qualify for permanent financing on the unspecified home to be built with BRSB prior to their approval. The Loan Policy cautioned that "undesirable loans" included loans such as this "for the purchase of land carried for speculative purposes, without definite plans for ultimate disposition." The CM listed a weakness of credit for this loan as "[p]rimary repayment is construction loan [] that [has] not been approved."

131. The secondary sources of repayment listed in the CM were "1) Ability to carry long term [and] 2) Collateral value." The CM and LAS stated that "alternative documentation" was used to underwrite this loan. No financial information regarding the borrowing entity was analyzed by the Defendants. In violation of the Loan Policy, the Defendants also did not analyze the current status of the Providence Downs South subdivision prior to their approval, despite the

43

fact that BRSB already had substantial exposure to that subdivision through other borrowers. A subsequent modification memorandum in the loan file listed "location of property" as a weakness of credit for this loan.

132. No tax returns or W-2s were required of the two guarantors. Instead, the Defendants relied on 12 months of deposits into three bank accounts and 6 months of deposits into a fourth bank account to estimate the guarantors' annual income. Those bank account statements offered no proof of actual income, much less re-occurring income, and to have relied on such statements was contrary to prudent lending practices. A copy of the guarantors' 2007 federal tax return in the loan file confirmed that the guarantors' total income for that year was less than half of the "alternative documentation" income estimate used to underwrite this loan. The CM stated that the guarantor husband, who was the 100% owner of BCH, had been building homes as "self-employed" for only two years and had not yet finished building "his first spec" with BRSB. The guarantors' personal financial statement listed no cash on hand, no retirement funds, and liabilities in excess of $2 million. The financial information presented to the Defendants did not demonstrate that the borrower or guarantors were a legitimate source of repayment for this loan.

133. In further violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval. Had the Defendants reviewed the appraisal prior to their approval, as required, they would have confirmed that the loan's 99.7% LTV significantly exceeded the 65% LTV limit set by the Loan Policy for the purchase of raw land. However, even before receipt of the appraisal, the CM listed an estimated 100% LTV for this loan, clearly demonstrating that the Defendants knew or should have known at the time of

44

their approval that the loan's LTV would violate the Loan Policy. The loan's excessive LTV was specifically criticized in CRM's Report.

134. The CM listed an additional weakness of credit for this loan as "100% LTC". Despite the Loan Policy's emphasis on the importance of "hard" equity for CRE loans and the Defendants' prior representation to the OTS that a minimum of 15% equity would be required for all speculative construction and development loans, the Defendants did not require any equity contribution from the borrower or guarantors for this loan. The lack of equity for this loan was specifically criticized in CRM's Report.

135. This loan was one of several Loss Transactions that were the subject on specific criticisms and warnings by BRSB Chief Credit Officer, Wood. In the underwriting checklist for this loan, Wood raised multiple red flags: "PFS unsigned; Purchase contract incomplete; Appraiser hasn't seen property; Income doubled since 12-06 …; Debt more than doubled; 6/6/07 have requested [loan officer] to rework using the figures from October – income has not doubled!" In a separate email to the loan officer, Wood further stated: "Same situation we discussed yesterday, the borrower[']s income has doubled from their October loan and it is not acceptable….[W]hy [are] they … claiming these impossible scenarios? Is there any new business we can solicit in Charlotte rather than 'loading' borrowers to levels they may not be able to handle …. [W]e may have to consider full documentation as the bank statements seem to be causing negative issues." On the underwriting checklist, Wood also noted: "Discussed with Dwayne [Wiseman] – wants loan to proceed – noted my concerns about the tight cash flow & discrepancies w/ the file."

136.     As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $233,000 were sustained.

### 11.     The SEB and BHB Loan

137.     In June 2007, Defendants Taylor and Wiseman approved a $3.785 million loan to SEB and BHB to pay off a prior land acquisition loan, with an outstanding balance of $199,456, and to finance the construction of 14 condominiums on that property in Black Mountain, North Carolina.  The loan was secured by a first deed of trust on that property, a second deed of trust on eight rental properties, and the pledge of a securities account valued at $58,000 at the time the loan was approved.  The Loan Policy cautioned that "undesirable loans" included loans such as this "secured by a second or other junior deed of trust."  The CM stated that the borrowers were a psychiatrist and a homemaker.

138.     The CM listed the primary and secondary sources of repayment for this loan as "sale of the condominiums" to be built and "liquidation of collateral," respectively.  At the June 4, 2007 Board meeting, only four days before this loan was approved, Defendant Wiseman stated that due to "current market conditions slowing … [the] loan committee is being more cautious." The Defendants' approval of this deficient loan did not reflect a "more cautious" lending approach.  The CM listed two weaknesses of credit for this loan as: "1. The General Contractor … is not a borrower or guarantor on the note … [and] 2. Housing sales may slow due to the rising interest rate environment."

139.     The Defendants approved this loan despite obvious deficiencies in the valuation of the collateral property.  The appraisal for the condominium property, which artificially inflated the value of the condominiums to be built and the actual LTV for this loan, "assume[d] all units valued currently as if completed with no regard to future potential change in costs or

46

prices. Therefore, no discounted cash flow analysis was provided per lender request." The appraisal did not take into account the negative market conditions noted in the CM and acknowledged by Defendant Wiseman at the June 4, 2007 Board meeting. One of the three comparables used in the appraisal also was a single family home, and not a multi-unit townhome like those to be built.

140. In violation of the Loan Policy, the Defendants did not require an appraisal of, or otherwise verify the actual value of BRSB's second lien positions on, the eight rental properties taken as additional collateral for the loan. The loan file contained tax valuations for only three of the eight rental properties. As confirmed in CRM's Report, tax values are a poor indicator of real estate market value. Without confirming the actual value of BRSB's second deeds of trust, the Defendants could not know whether those rental properties provided additional collateral support for the loan.

141. The LAS stated that "alternative documentation" was used to underwrite this loan. No tax returns or W-2s were required of the borrowers. Instead, the Defendants relied on net cash proceeds from nearly year-old sales of townhomes from another project to estimate the borrowers' annual income. Those prior sales offered no proof of current income, much less re-occurring income, and to have relied on those sales was contrary to prudent lending practices. Reliance on those sales also violated the Loan Policy's "alternative documentation" provision that 12 months of bank statements were required to estimate annual income. The borrowers' 2007 federal tax return in the loan file confirmed that the borrowers' actual income in 2007 was less than 40% of the "alternative documentation" annual income estimate used to underwrite this loan. The borrowers' personal financial statement, as well as the limited financial information

provided for the additional guarantors, confirmed that the borrowers and guarantors did not have the ability to repay this loan.

142.    A January 22, 2009 BRSB loan workout worksheet in the loan file admitted in the "Root Cause of Problem" section of the worksheet that this loan was "not underwritten to standards at origination."

143.    As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $1.018 million were sustained.

### 12.    The KAK and EJK Loan

144.    In September 2007, Defendants Taylor and Wiseman approved a $1.498 million loan to KAK and EJK to pay off a prior BRSB loan, with an outstanding balance of $372,804, used to purchase a lot on Lake Keowee in South Carolina and to construct a second home on that lot.  The loan was secured by a first mortgage on the lot on which the home would be built and a second deed of trust on the borrowers' residence in Asheville, North Carolina.  The Loan Policy cautioned that "undesirable loans" included loans such as this "secured by a second or other junior deed of trust."  In violation of the Loan Policy, no documentation was presented to the Defendants or otherwise contained in the loan file that confirmed the actual value of that second deed of trust.

145.    Also in violation of the Loan Policy, the Defendants approved this loan on September 27, 2007, before the loan officer had even prepared his October 1, 2007 CM.  Had the Defendants analyzed the CM prior to their approval, as required, they should have recognized the CM and loan's obvious deficiencies.

146.    The CM listed a weakness of credit for this loan as "[l]arge dollar home."  The CM stated that the primary source of repayment for this loan was "[n]ormal cash flow from

48

income." The secondary sources of repayment listed were: "1) [Second bank's] [t]ake out on construction; 2) Collateral value; [and] 3) Cash flow." The CM did not explain why cash flow was listed both as the primary and a secondary source of repayment. Even though permanent financing with a second bank was listed as a secondary source of repayment for the loan, the Defendants did not require that the borrowers qualify for that financing prior to the Defendants' approval of this loan.

147. The LAS stated that this loan was underwritten as a "full" documentation loan. In violation of the Loan Policy, the loan package for this loan included no borrower pay stubs, and only one W-2 form for one borrower and the borrowers' 2005 federal tax return. The cash flow worksheet in the loan file estimated the borrowers' income based on a 29 month average utilizing that stale tax return and internally prepared profit and loss statements from their two businesses from 2006 and YTD 2007. Both businesses provided kitchen, bathroom, and deck finishes to homes in the Asheville area. One of the businesses showed negative net income both for 2006 and for the first five months of 2007. The borrowers' personal financial statement showed limited liquidity and inflated values for their businesses, and also stated that "tax obligations were past due." Based on their knowledge of the depressed real estate market and how it would continue to negatively impact the borrowers' businesses, the Defendants knew or should have known that the borrowers' "normal cash flow from income" would not be a legitimate primary source of repayment for the loan.

148. In further violation of the Loan Policy, no appraisal of the home to be built was received or reviewed by the Defendants prior to their approval of the loan. Had the Defendants reviewed the appraisal prior to their approval, as required, they would have confirmed that the appraised value of the home to be built reflected 100% of the loan amount. With no

confirmation of the actual value of the second deed of trust on the borrower's primary residence, this loan was 100% LTV, significantly in excess of the 75% LTV limit set by the Loan Policy for the construction of this home based on the borrowers' credit scores.

149.     As a direct and proximate result of the negligent and grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $839,000 were sustained.

### 13.     The Longview Land Company Loan

150.     In January 2008, Defendants Taylor and Wiseman approved a $2.8 million loan to Longview Land Company, LLC ("Longview") to purchase 52 acres to be used to develop vacation property near the entrance of The Cliffs at Walnut Cove development in Arden, North Carolina.  The loan was secured by a first deed of trust on the acquired land.

151.     The CM stated that "alternative documentation" was used to underwrite this loan. The CM listed the primary source of repayment for this loan as "normal income" of Longview's holding company – The Cliffs Communities, Inc. ("CCI") – which was not a borrower or guarantor on the loan.  The Defendants did not analyze any financial information regarding the borrower entity or the current status of its current development projects.  The CM stated that CCI was "in the process of moving their banking relationship," but did not specify why such a move was necessary.  An email in the loan file from a CCI officer shortly after the loan was approved confirmed that the move was necessary because CCI's primary lender was "reluctant to commit" any additional financing on CCI's development projects.  In violation of the Loan Policy, the Defendants did not analyze the current status of CCI's banking relationship or its numerous other development projects, and the financial information submitted to support CCI's alleged "normal income" was stale, internally prepared, and reflected substantial contingent liabilities.  The CM listed two credit weaknesses for the loan as "primary repayment is sell [sic] of lots/homes" and

50

"depression of real estate market." The Defendants did not analyze in which CCI development(s) those lot/home sales allegedly would occur.

152. The secondary sources of repayment listed in the CM were "guarantor support" and "collateral sale." In violation of the Loan Policy requirement that "current" financial information be reviewed, the guarantor's personal financial statement was more than one year old. His financial statement also reflected minimal liquidity. The LAS signed by the Defendants required that the loan officer get the guarantor's personal financial statement "current after closing," evidencing the Defendants' knowledge that they were relying on stale financial information to approve the loan. No updated personal financial statement was ever received from the guarantor. The alleged strength of his personal guarantee was based on the viability of his development projects, which had come to a dramatic halt when the vacation second home market collapsed in western North Carolina before this loan's approval.

153. The CM listed a 100% LTV for this loan which was significantly higher than the 75% limit set by the Loan Policy for land development loans.

154. In further violation of the Loan Policy, no appraisal of the collateral was received or reviewed by the Defendants prior to their approval. Had the Defendants reviewed the appraisal prior to their approval, as required, they would have been aware of the appraisal's obvious deficiencies. The 52 acres which served as collateral were included within 104 total acres being appraised. The 52 acres were not specifically identified or otherwise separately valued in the appraisal. The collateral acres were the more interior, more topographically challenging part of the 104 acres; thus, the use of a per-acre calculation to assess the value of the collateral was not appropriate. The appraisal contained a detailed analysis of the economic condition of Henderson County, which was adjacent to but at least ten miles south of Buncombe

51

County, where the subject property was located.  The comparables used in the appraisal, which were between two and three years old, were outdated.

155.    The CM also listed a 100% LTC for this loan.  The Loan Policy was amended, effective November 26, 2007, to state: "All Development loans require minimum of 20% cash injection or other collateral of equal value."   In violation of that provision, the Defendants did not require that the borrowers, guarantor or CCI provide any equity for this loan.

156.    The deficient underwriting of this loan was heavily criticized in CRM's Report.

157.    As a direct and proximate result of the grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $1.229 million were sustained.

### 14.    The AK and LK Loan

158.    In September 2008, Defendants Taylor and Wiseman approved a loan to a builder, AK, and his wife, LK, in the amount of $968,000.  The purpose of this loan was to provide: (1) $422,537 to purchase a partially built home in foreclosure at BRSB (the "Foster Estates" property); (2) $300,000 to complete that home; (3) $150,000 to complete a second home already partially built by AK (the "Moore's Valley" property); (4) $75,000 for interest reserves for this loan; and (5) $20,000 to pay off a related concrete lien.  This loan was secured by first and second deeds of trust on the Foster Estates and Moore's Valley properties.  The Loan Policy cautioned that "undesirable loans" included loans such as this "secured by a second or other junior deed of trust."

159.    The CM stated that the primary and secondary sources of repayment for this loan were "[s]ell [sic] of homes" and "collateral value," respectively.  The CM also listed the primary source of repayment as a weakness of credit for the loan.  The CM listed a second weakness of credit for this loan as: "This is a workout."  The CM described AK as follows: "[AK] has gotten

52

behind on his payments and loans w/ BRSB due to fact of not finishing his homes and unable to sell. We foreclosed on 2 homes, one of which we were outbid on the courthouse steps and one we are in the process of selling. He has 2 loans left." The CM noted that the borrowers had very low credit scores. Handwritten notes on the CM also indicated that the loan file for the Bank's prior loan to the borrowers related to the Moore's Valley property was "missing". Despite these obvious red flags, the Defendants approved this additional loan to the borrowers.

160. The LAS stated that this loan was underwritten as a "NIQ," or non-income qualifying, loan. The Loan Policy stated that NIQ loan amounts could not exceed $200,000 and CRE loans could not be done as NIQ loans. In violation of those provisions, this loan was both a CRE loan and well in excess of that funding threshold. Contrary to prudent lending practices, the Defendants did not analyze the borrowers' financial condition. The only tax return in the loan file was an unsigned copy of the borrowers' 2007 federal tax return, dated after the loan had closed, which showed negative income for that year. The Defendants also did not require that the borrowers provide personal guarantees for this loan.

161. The Defendants relied on two stale and otherwise deficient appraisals of the subject properties to approve the loan. The appraisal of the Foster Estates property was more than two years old, well in excess of the Loan Policy's 12 month appraisal age limit. That appraisal used comparables located several miles from the property and noted that, due to its 21% adjustment, comparable "Sale 1 exceeds the recommended FNMA guidelines for net adjustments." That appraisal also stated that the "subject may be considered to be overbuilt for the immediate area." The appraisal for the Moore's Valley property was almost 18 months old, also in violation of the Loan Policy's appraisal age limit. The Moore's Valley appraisal similarly used comparables located several miles from the property. The Moore's Valley appraisal noted

that sales of similar properties were "extremely limited … in the subject's immediate area" and that the "subject's quality is superior to the average home in the subject's immediate neighborhood." The LAS provided an estimated 77.5% LTV for this loan which exceeded the 65% LTV limit set by the Loan Policy for NIQ loans to borrowers with low credit scores. The actual LTV for this loan was much higher given the properties' stale and inflated appraised values.

162. The Loan Policy was amended, effective June 5, 2008, to state: "All Speculative Construction loans will require 15% of the total costs for the cash down payment." In violation of that provision, the Defendants did not require that the borrowers provide any cash down payment for this loan.

163. As a direct and proximate result of the grossly negligent approval of this loan by the Defendants, and the breach of their fiduciary duties to the Bank, damages of at least $375,000 were sustained.

## V. CAUSES OF ACTION

### A. Negligence

164. The FDIC-R incorporates by reference each of the allegations in the above paragraphs 1-163 as if fully restated herein.

165. Defendants Taylor and Wiseman owed duties of care to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, oversight, and conduct of the Bank's business and financial affairs, including its lending practices. *See* N.C.G.S.A. §§ 55-8-30 and 55-8-42. Both Defendants agreed and were obligated by statute and/or common law to diligently and honestly administer the affairs of the Bank, and were under a duty to ensure that their actions were in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank.

54

166.     Defendants Taylor and Wiseman, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.  As the Bank's President and Chief Executive Officer, directors, and members of the Loan Committee, the Defendants' duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally-accepted prudent lending practices and principles; informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; ensuring that the loans they approved were underwritten in a safe and sound manner; ensuring the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that the loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

167.     Notwithstanding these duties, Defendants Taylor and Wiseman approved all fourteen of the Loss Transactions, as described herein, in violation of the Bank's Loan Policy and contrary to generally prudent lending practices.  Also as described herein, the Defendants' approval of the Loss Transactions was not a product of a rational process and the Defendants did not avail themselves of all material and reasonably available information.

168.     By their actions and inactions, as described specifically and generally herein, the Defendants failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

      a.     Pursuing an aggressive growth strategy that resulted in undue concentrations of CRE loans and that placed short-term income and profits ahead of

compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

b.      Failing to ensure that the Bank's CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

c.      Disregarding and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags," with respect to the Bank's CRE lending and the Loss Transactions;

d.      Failing to inform themselves about the risks that the Loss Transactions posed to the Bank before they approved them;

e.      Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;

f.      Failing to ensure that the Loss Transactions approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

g.      Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

h.      Failing to ensure that the Loss Transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

i.      Approving Loss Transactions without proper analysis of the feasibility of the project being funded;

j.      Approving Loss Transactions without proper analysis of the global cash flows of the borrowers and/or guarantors;

        k.      Failing to implement and monitor prudent risk management strategies; and

        l.      Approving loans which violated the Bank's Loan Policy and sound and prudent underwriting standards.

169.    As a direct and proximate result of the Defendants' negligence regarding the twelve Loss Transactions approved prior to December 31, 2007 described in paragraphs 62-149 above, damages in the amount of at least $5.979 million were sustained.

**B.    Gross Negligence**

170.    The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

171.    Section 1821 (k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 182l(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Under North Carolina law, gross negligence is something more than ordinary negligence but less than a willful act. *See*, *e.g.*, N.C.G.S.A. § 1D-5(7) ("'Willful or wanton conduct' means more than gross negligence").

172.    In the alternative with respect to the twelve Loss Transactions approved prior to December 31, 2007 described in paragraphs 62-149 above, and with respect to the two Loss Transactions approved after December 31, 2007 described in paragraphs 150-163 above, the Defendants breached their duties to the Bank and were grossly negligent by committing the acts and omissions alleged herein.

173.    Notwithstanding their knowledge of the numerous warnings and other deficiencies alleged herein, the Defendants approved the Loss Transactions anyway, in reckless disregard for the safety of the Bank, its depositors and accountholders, and others.

174. As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, damages in the amount of at least $7.583 million were sustained.

### C.     Breach of Fiduciary Duty

175. The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

176. As directors, one of whom also was an officer, of the Bank, both Defendants occupied a fiduciary relationship with the Bank, which placed a special trust and confidence in the Defendants. The Defendants owed the Bank a duty to act with the utmost good faith, honesty, and loyalty in the management and conduct of the Bank's business, property and financial affairs and work with due regard to and to advance the interests of the Bank.

177. By their actions and inactions as described in this Complaint, the Defendants failed and neglected to fulfill their respective fiduciary duties to the Bank. The Defendants allowed the Bank's assets to be wasted by approving the Loss Transactions without adherence to the Bank's Loan Policy and prudent lending practices, among other things.

178. In the alternative to the negligence and gross negligence causes of action in this Complaint, the acts and omissions of both Defendants, described herein and above with respect to all fourteen of the Loss Transactions, constitute breaches of their fiduciary duties to the Bank. As a direct and proximate result of the Defendants' breaches of their fiduciary duty to the Bank, damages in the amount of at least $7.583 million were sustained.

## VI.     DEMAND FOR JURY TRIAL

The FDIC-R demands a trial by jury on all issues.

58

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Federal Deposit Insurance Corporation as Receiver for Blue Ridge Savings Bank, Inc. requests entry of judgment in its favor against the Defendants as follows:

1.      For compensatory damages, in an amount to be proved at trial;

2.      For its costs and other expenses incurred by it in connection with this proceeding;

3.      Pre- and post-judgment interest as allowed by law; and

4.      Such other and further relief as the Court deems just and proper.

Dated:  October 10, 2014                    Respectfully Submitted,


**/s/ John F. Bloss**
John F. Bloss
NC Bar No. 23947
jbloss@greensborolaw.com
**Higgins Benjamin, PLLC**
101 W. Friendly Ave., Suite 500
Greensboro, North Carolina 27401
Phone: (336) 273-1600
Fax: (336) 274-4650

Kyle M. Keegan
LA Bar No. 19942 (*pro hac vice pending*)
kmk@keegandenicola.com
Susannah M. DeNicola
LA Bar No. 21558 (*pro hac vice pending*)
smd@keegandenicola.com
Chris D. Kiesel
LA Bar No. 26360 (*pro hac vice pending*)
cdk@keegandenicola.com
**Keegan, DeNicola, Kiesel, Bagwell,
Juban & Lowe, LLC**
5555 Hilton Ave., Suite 205
Baton Rouge, Louisiana 70808
Phone: (225) 364-3600
Fax: (225) 364-3608

ATTORNEYS FOR PLAINTIFF
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
BLUE RIDGE SAVINGS BANK, INC.